PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellant,*

v.

ROBERT NELSON MAY,
        *Defendant-Appellee.*

No. 03-4589

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, Chief District Judge.
(CR-00-165-MU)

Argued: January 23, 2004

Decided: March 4, 2004

Before WILLIAMS, TRAXLER, and KING, Circuit Judges.

Vacated and remanded by published opinion. Judge King wrote the opinion, in which Judge Williams and Judge Traxler joined.

## COUNSEL

**ARGUED:** R. Alexander Acosta, Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Robert James Conrad, Jr., United States Attorney, Charlotte, North Carolina, for Appellant. Noell Peter Tin, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Dennis J. Dimsey, Angela M. Miller, Civil Rights Division, Appellate Section, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Jennifer Marie

Hoefling, Assistant United States Attorney, Charlotte, North Carolina, for Appellant.

---

**OPINION**

KING, Circuit Judge:

After being convicted of two offenses relating to his involvement in burning a cross for the purpose of racial intimidation, defendant Robert Nelson May was sentenced in the Western District of North Carolina to one month in prison, with credit for time served, plus two years of supervised release, with five months of home detention. *United States v. May*, No. 3:00cr165-1-Mu (W.D.N.C. July 3, 2003). The Government has appealed, maintaining that the court erred in granting May a downward departure for victim conduct and aberrant behavior, and in awarding him a sentence adjustment for acceptance of responsibility. Because the downward departure was not warranted and the court clearly erred in awarding the sentence adjustment, we vacate and remand.

I.

A.

In April 1999, Anthony Sanders, an African-American man, moved into the home of Jacquelette Paige Williams, a Caucasian woman, in Gastonia, North Carolina. Relations between Sanders and his neighbors were poor from the start. On April 11, 1999, Charles Danny Carpenter, who lived next door to the interracial couple, and defendant May, who lived about a half mile away, added the words "ESPECIALLY NIGGERS" to a "NO TRESPASSING" sign located on Carpenter's property and facing Sanders and Williams's home.

On May 11, 1999, while Sanders was washing his car in his driveway, May walked to the property line, pointed a handgun at Sanders, and said, "Hey, nigger, I got something for you." In response, Sanders said that he also had something for May.

Later that day, May and Carpenter constructed a wooden cross and erected it at the edge of Carpenter's property, approximately twenty feet from Sanders and Williams's home. That evening, May and Carpenter set the cross afire and sat near it in lounge chairs, drinking beer and holding firearms, watching the cross burn. At some point that evening, Williams called the police to report shots being fired from behind Carpenter's house. When officers arrived and saw the burning cross, May and Carpenter told them that they were burning the cross to "let the nigger know he wasn't welcomed here." The officers then spoke with Williams, who appeared nervous, and they noted that the burning cross was visible from her yard.

## B.

As a result of these events, May and Carpenter were indicted on September 11, 2000, by a grand jury in the Western District of North Carolina, and charged with three criminal offenses. In Count 1 of the Indictment, the two men were charged with the civil rights offense of conspiring to threaten and intimidate Sanders and Williams because of race, or because of association with a person of another race, in order to interfere with their right to occupy a dwelling without threats or interference, in contravention of 18 U.S.C. § 241.[1] The Indictment alleged that May and Carpenter committed four overt acts in further-ance of their conspiracy, that is: (1) posting the "NO TRESPASSING ESPECIALLY NIGGERS" sign for a month; (2) pointing a handgun at Sanders and telling him he had something for him; (3) erecting a cross on Carpenter's property approximately twenty feet from the vic-tims' home; and (4) setting the cross on fire and watching it burn while possessing firearms.

---

[1]Section 241 of Title 18, enacted following the Civil War to enforce the Civil Rights Act of 1866, provides, in pertinent part:

> If two or more persons conspire to injure, oppress, threaten, or intimidate any person . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same . . . —

> They shall be fined . . . or imprisoned . . . or both . . . .

18 U.S.C. § 241.

In Count 2 of the Indictment, May and Carpenter were charged with violating 42 U.S.C. § 3631(b)(1), in that they, by force, threat, and through the use of fire (i.e., burning the cross) intimidated and interfered with Sanders and Williams because they occupied a dwelling in Gaston County.[2] Count 3 of the Indictment, which was later dismissed, alleged that May and Carpenter had also violated 18 U.S.C. § 844(h)(1).

May was arrested on September 15, 2000, and released on bond. He subsequently violated the conditions of his release on three occasions by the use of illegal drugs. He first tested positive for marijuana on January 4, 2001. Initially, May adamantly denied having used marijuana on that occasion, but he later signed a statement admitting that he had. May again tested positive for marijuana on October 4, 2001, again denied drug use, and later admitted to it. He was then placed in an intensive outpatient drug treatment program.

Four days before his scheduled trial, on January 18, 2002, May pleaded guilty to Counts 1 and 2 of the Indictment, and the Government agreed to dismiss Count 3. On February 21, 2002, May tested positive for cocaine. When confronted, he again denied drug use, claiming that he had tested positive because he had "recently been with a female who had cocaine on her tongue and that they had been kissing and that she had performed oral sex on him." Due to his use of illegal drugs, May's bond was revoked on May 28, 2002, and he served seventy-three days in custody in an inpatient drug treatment program. He was released from custody on July 30, 2002.

At May's June 17, 2003, sentencing proceedings, the district court accepted the plea agreement between the parties and imposed its sentence on May. In so doing, the court first considered whether May's sentence should be reduced for acceptance of responsibility pursuant to U.S. Sentencing Guidelines Manual (U.S.S.G.) section 3E1.1. According to his presentence report (the "PSR"), May had a Criminal

[2]Section 3631(b)(1) of Title 42 provides, in pertinent part, "[w]hoever . . . by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with — any person because he is or has been . . . [occupying a dwelling] . . . shall be fined . . . or imprisoned . . . or both. . . ." 42 U.S.C. § 3631(b)(1).

History Category of I and an Offense Level of 15, resulting in a sentencing range of eighteen to twenty-four months. The probation officer recommended that May be denied the adjustment for acceptance of responsibility because he had violated the terms of his bond multiple times and, during his presentence interview, had minimized his role in the offenses and denied key facts.[3] The court disagreed with this recommendation, however, and awarded May the acceptance of responsibility adjustment, reducing his Offense Level to 13.

The court then heard argument and testimony regarding May's motion for a downward departure based on (1) victim conduct, *see* U.S.S.G. § 5K2.10, (2) aberrant behavior, *id.* § 5K2.20, and (3) diminished capacity, *id.* § 5K2.13. In support of his motion regarding victim conduct, May presented the testimony of a private investigator hired by his lawyer. The investigator testified that she had interviewed people who lived near Sanders, and they blamed Sanders for the deterioration of the neighborhood. The court then heard testimony from Bobby Fewell, an African-American male who had worked with May in the postal service for more than ten years. Fewell testified that May had never had problems with his coworkers at the post office, the majority of whom were African-American.

In ruling on May's motion for a downward departure based on victim conduct, the court observed:

> I agree with the government that Ms. Williams didn't do anything to provide a provocation but that the persistence of animus from this Sanders guy to the rest of the people in the neighborhood, the total persistence of his hostility to everybody, the motions of the way he's acted, it seems to me are extremely persistent.

---

[3]After pleading guilty to Counts 1 and 2 of the Indictment, May submitted a statement to the probation officer concerning his offenses. In that statement, he purported to accept responsibility for his crimes, but he claimed that Sanders was responsible for thefts in the neighborhood, had fired a gun in the neighborhood, was a convicted felon, and had threatened Carpenter. May also asserted that he had taken the medication Xanax earlier on the day of the cross burning, which had mixed with the alcohol he had been drinking and affected his behavior that night.

He has a terrible record. He does, in fact, present — he's the kind of fellow that if he was here the government would be arguing, and I would be agreeing, needs to be incarcerated to protect the public wheel [sic].

So I think that there is relevant conduct by him that substantially contributed to the danger presented and that there is a victim conduct downward departure available.

With respect to the aberrant behavior basis for a departure, the court simply stated, "[t]he evidence of aberrant behavior I think, however, is clearly met under the language of the guidelines and I'm finding he has aberrant behavior." The court then granted May a three-level downward departure for victim conduct and aberrant behavior, leaving him with an Offense Level of 10.[4]

Finally, the court sentenced May to a month in custody (crediting him with time served for his bond violations), plus two years of supervised release, with five months of home detention. The Government has appealed, and we possess jurisdiction pursuant to 18 U.S.C. § 3742(b) and 28 U.S.C. § 1291.

## II.

Prior to April 30, 2003, we were obligated to review a district court's decision to depart from the Guidelines for abuse of discretion. On that date, a new statute, the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003, Pub. L. No. 108-21, 117 Stat. 650 (the "PROTECT Act") altered our standard of review, amending 18 U.S.C. § 3742(e) to require de novo review of downward departures in certain circumstances. For example, the PROTECT Act provides that, when determining whether the sentence "departs from the applicable guideline range based on a factor that — is not justified by the facts of the case;" "the court of appeals shall review de novo the district court's application of the guidelines to the

---

[4]The court denied May's motion for a downward departure based on diminished capacity, finding no nexus between May's Post-traumatic Stress Disorder and the events in question. May does not challenge the diminished capacity ruling on appeal.

facts." 18 U.S.C. § 3742(e)(3)(B)(iii), (e). We therefore review de novo the court's application of the victim conduct and aberrant behavior Guidelines to the facts of this case.[5]

On the other hand, we review for clear error a district court's decision to adjust a defendant's sentence for acceptance of responsibility. *United States v. Ruhe*, 191 F.3d 376, 388 (4th Cir. 1999). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

## III.

### A.

We turn first to the question of whether the victim conduct basis for May's downward departure was justified by the facts of this case. Section 5K2.10 of the Guidelines provides, "[i]f the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense." The Guidelines explain that section 5K2.10 "usually would not be relevant in the context of non-violent offenses" but that there may be "unusual circumstances in which substantial victim misconduct would warrant a reduced penalty

---

[5]The PROTECT Act also provides that a court of appeals shall set aside a sentence when the sentence departs from the applicable Guideline range and the district court failed to provide a written statement of the reasons for its departure. 18 U.S.C. § 3742(e)(3)(A), (f)(2)(B). Here, the court failed to provide such a statement. However, because the parties have not raised the issue and because we review de novo the application of the Guidelines to the facts even when the court fails to provide a written statement of reasons, *see id*. § 3742(e), we will proceed to assess whether the departure granted to May was justified by the facts of this case. *See id*. § 3742(e)(3)(B)(iii); *see also United States v. Archambault*, 344 F.3d 732, 735 n.3 (8th Cir. 2003) (addressing merits of departures even though district court failed to provide written statement of reasons, where neither party raised the issue). The materials before us are sufficient for us to make this assessment.

in the case of a non-violent offense." U.S.S.G. § 5K2.10.[6] Having conducted a de novo review of the court's application of the Guideline, we conclude that the circumstances of this case are not so unusual as to justify a downward departure based on victim conduct.

In support of the court's decision to depart downward, May relies on the testimony of his private investigator. At the sentencing hearing, the investigator testified that neighbors of the victims told her that (1) Sanders would "gig" them from his car;[7] (2) a neighbor had a generator stolen, and he had never had anything stolen before Sanders moved into the neighborhood; (3) May's cousin "ran Sanders off" from his outbuilding, and Sanders made lurid gestures at him; (4) Sanders was a dope pusher and a felon and had been caught with concealed weapons; (5) Sanders had discharged a firearm; and (6) the neighborhood had changed in some unspecified way since Sanders arrived.

As we have explained, the Guidelines provide that, to support a downward departure under section 5K2.10, the victim's conduct must, in fact, be "wrongful." *Id.*; *United States v. LeRose*, 219 F.3d 335, 340 (4th Cir. 2000) (reversing downward departure based on victim conduct for defendants who operated check kiting scheme because bank's failure to act did not constitute wrongful conduct); *United States v. Morin*, 80 F.3d 124, 127-28 (4th Cir. 1996) ("The plain meaning of [section 5K2.10] contemplates that the victim must actually have done something wrong."). In *Morin*, we explained that a mere perception on the part of the defendant that the victim has committed wrongful conduct will not suffice. *Morin*, 80 F.3d at 128. There, we addressed a situation in which the defendant erroneously believed that the husband of the woman he loved was beating her, and he hired a hit man to kill the husband. Reversing the downward

---

[6]The Guidelines provide an example of a situation in which a departure for victim conduct might be proper even when the victim's conduct provoked a non-violent crime: "an extended course of provocation and harassment might lead a defendant to steal or destroy property in retaliation." U.S.S.G. § 5K2.10.

[7]The term "gig" is not defined in the materials presented to this Court. At argument, counsel explained that the term refers to extending one's middle finger to another.

departure, we observed, "[a]s it appears that [the victim's] behavior was imagined rather than real, it cannot be said that he did anything wrong." *Id.*

In the circumstances of this case, some of May's allegations against Sanders fail to rise to the level of wrongful conduct. First, the fact that a neighbor had a generator stolen and assumed Sanders was the thief is not conduct that can, without some proof, be attributed to Sanders. Similarly, the neighbors' perception that the neighborhood had changed in some unspecified way since Sanders moved in not only smacks of a racist "there goes the neighborhood" mentality but also defines no wrongful conduct. We are left, then, with May's allegations of "gigging," trespass onto May's cousin's property, past criminal acts, and discharge of a firearm, as Sanders's only arguably wrongful conduct provoking the cross burning.[8]

The language of the Guideline next requires us to determine whether the wrongful conduct "contributed significantly to provoking the offense behavior."[9] U.S.S.G. § 5K2.10. In making this determination, we are to consider the following six factors:

---

[8]May also maintained in his PSR statement that Carpenter had asserted that Sanders had threatened him and that Carpenter asked May to come to his house because he was afraid that Sanders would follow up on the threat. The veracity of this statement is called into question by the fact that, when the police arrived, May and Carpenter told them that they were attempting to "let the nigger know he wasn't welcomed here," never mentioning a threat. May explained his behavior the same way to a newspaper reporter. Furthermore, if May was referring to Sanders's "I've got something for you, too" comment, it was May who first threatened the unarmed Sanders.

[9]We recognize, as May maintains, that he need not prove that his actions were legally justified. *See United States v. Harris*, 293 F.3d 863, 872 (5th Cir. 2002); *Blankenship v. United States*, 159 F.3d 336, 339 (8th Cir. 1998). At the same time, a showing that the victim's actions were a but-for cause of the defendant's criminal activity is not sufficient. *See United States v. Mussayek*, 338 F.3d 245, 255 (3d Cir. 2003); *United States v. Corrado*, 304 F.3d 593, 615 (6th Cir. 2002). The standard lies somewhere in between justification and mere causation: the defendant must show that the victim's conduct "contributed significantly to provoking the offense behavior." U.S.S.G. § 5K2.10.

(1)     The size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant.

(2)     The persistence of the victim's conduct and any efforts by the defendant to prevent confrontation.

(3)     The danger reasonably perceived by the defendant, including the victim's reputation for violence.

(4)     The danger actually presented to the defendant by the victim.

(5)     Any other relevant conduct by the victim that substantially contributed to the danger presented.

(6)     The proportionality and reasonableness of the defendant's response to the victim's provocation.

*Id.*

May has presented no evidence regarding the physical characteristics of his victims or himself, nor has he pointed to any efforts he took to address the neighborhood tensions in a more positive manner.[10] As for factors (3), (4), and (5), there is no evidence that Sanders posed any danger to May at all. The only evidence that comes close is that Sanders — unarmed — responded that he "had something for [May] too" when May threatened him with a firearm. We decline to give May the benefit of a downward departure for conduct that he himself provoked. And, even if the hearsay regarding Sanders's reputation in the neighborhood as a dope pusher and carrier of a concealed weapon is accepted, there is no evidence that he was ever violent or that any violence was directed at May. We conclude, therefore, that Sanders did not present a danger to May and that May could not reasonably have perceived that he did.

---

[10]The fact that May and Carpenter were armed (apparently with two weapons — a handgun and a shotgun or rifle) as they sat beside the burning cross indicates that they were anticipating confrontation, not attempting to prevent it.

Finally, we turn, as we are required to do, to the proportionality and reasonableness of May's response to the "gigging," the trespass onto his cousin's property, the criminal history, and the discharge of a firearm. *See id.* § 5K2.10(6); *Morin*, 80 F.3d at 128 (finding that "'concern for the proportionality of the defendant's response is manifested by the terms of § 5K2.10'") (quoting *United States v. Shortt*, 919 F.2d 1325, 1328 (8th Cir. 1990)). As the Eighth Circuit held in *Shortt*, even highly provocative behavior does not justify a downward departure if the defendant's response is disproportionate. The court explained, "[w]hile the District Court is surely correct that 'there's hardly any greater provocation than to have someone having an affair with your spouse,' that is not the end of the matter. The further question remains: provocation for what?" *Shortt*, 919 F.2d at 1328 (internal citation and alteration omitted) (recognizing wrongfulness of adultery but finding defendant's plot to blow up adulterers disproportionate); *see also United States v. Paster*, 173 F.3d 206, 212 (3d Cir. 1999) (concluding that fatally stabbing wife was disproportionate to her revelation of past infidelities); *Blankenship v. United States*, 159 F.3d 336, 339 (8th Cir. 1999) (finding defendant's actions not proportional where victim yelled and threatened defendant from outside defendant's home but was unarmed, and defendant left through back door, returned with gun, and shot victim in ensuing struggle).

In these circumstances, cross burning was a disproportionate and unreasonable response to the victim's conduct. The Supreme Court recently recognized the severity of such activity, noting that cross burning "is a particularly virulent form of intimidation." *Virginia v. Black*, 123 S. Ct. 1536, 1549 (2003) (upholding state's ban on cross burning). As the Court explained, "the burning cross often serves as a message of intimidation, designed to inspire in the victim a fear of bodily harm. Moreover, the history of violence associated with the Klan shows that the possibility of injury or death is not just hypothetical." *Id.* at 1546.

In our view, the victim's conduct in this case was not sufficient to provoke a response of this magnitude. First, Sanders's "gigging" of his neighbors, though crass, hardly constitutes provocation for a cross burning.[11] A crime of intimidation loaded with a history of racial ter-

---

[11]Although we have proceeded with the analysis, we express some skepticism regarding whether "gigging" can reasonably be considered

ror is not a proportional response to a gesture — admittedly tasteless — made daily on the highways at rush hour.[12] Sanders's isolated trespass onto May's cousin's property is also insufficient to justify the downward departure. Perhaps the question would be closer if Sanders had trespassed onto May's property, but we decline to reward May for taking it upon himself to exact vigilante justice in the neighborhood for wrongs committed against others. *See Mussayek*, 338 F.3d at 256 (finding conspiracy to commit extortion through use of thugs willing to break legs and kidnap children not proportional to victim's swindling of defendant; agreeing with district court that "the redress that would be appropriate would be a lawsuit, a resort to a report to the police"). Similarly, even if May had a reasonable basis to believe that Sanders had a questionable past and was a felon in possession of a firearm, such wrongful conduct was not directed at May; law enforcement officials are equipped to handle such matters and do not require self-deputized citizens to act on their own. Again, a call to the police would have been a reasonable response to identifying a person as a felon in possession — burning a cross was not.

Finally — and importantly — we recognize that Sanders was not

wrongful conduct. Such gestures are rude, certainly, and perhaps offensive, but a mere breach of social etiquette does not constitute wrongful conduct. *See United States v. Desormeaux*, 952 F.2d 182, 187 (8th Cir. 1991) (explaining that, where victim rode around with defendant's boyfriend on back of his motorcycle and smirked at defendant, victim's conduct, "though probably a breach of dating etiquette, was not wrongful within the meaning of this guideline").

In addition, there is nothing inherently wrongful about discharging a firearm; moreover, Williams called the police the evening of the cross burning to complain that *May* was discharging a firearm. And to the extent that May claims that Sanders's wrongful conduct consisted of being a felon in possession of a firearm, such conduct is plainly insufficient to provoke a cross burning. *See infra* p. 13.

[12]May maintains that the "gigging" was a persistent course of conduct sufficient to sustain an exception to section 5K2.10's rule that the provision generally does not apply to non-violent crimes. He presents no evidence, however, regarding the frequency of this behavior or the number of times it was directed at May.

the only victim of May's crimes. Ms. Williams, too, was a victim, and May does not allege that she provoked him in any way. Harming innocent victims certainly weighs against a defendant in our proportionality analysis. In light of this discussion, the alleged wrongful conduct on the part of the victim was insufficient provocation for burning a cross.[13]

## B.

We next consider whether the facts of this case support a downward departure for aberrant behavior under U.S.S.G. section 5K2.20. That section provides, inter alia, that "a downward departure may be warranted in an exceptional case if . . . the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life."[14] U.S.S.G. § 5K2.20. Under the Guideline, then, we must first determine whether May's case is exceptional. *See id.* at app. C, amend. 603 ("As a threshold matter, this amendment provides that the departure is available only in an extraordinary case.").[15]

---

[13]We note also that May and Carpenter altered the "NO TRESPASSING" sign just days after Sanders moved into the neighborhood, casting further doubt on May's contention that his acts of racial intimidation occurred only after extended provocation by Sanders.

[14]Section 5K2.20 prohibits departing downward based on aberrant behavior when, inter alia, "[t]he defendant discharged a firearm or otherwise used a firearm or a dangerous weapon." U.S.S.G. § 5K2.20(c)(2). As the Guidelines explain, "'Otherwise used' with reference to a dangerous weapon (including a firearm) means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." *Id.* § 1B1.1, cmt. n.1(I). Because May does not meet the requirements of section 5K2.20, we need not determine whether his act of pointing the handgun at Sanders constituted "more than brandishing, displaying, or possessing a firearm." *Id.*

[15]Amendment 603 refers to section 5K2.20's previous requirement that a case be "extraordinary" in order to warrant a downward departure for aberrant behavior. Effective April 20, 2003, the section was amended in a number of ways and now uses the term "exceptional" instead of "extraordinary." Because the amendment was intended to "further restrict[ ] the availability of departures based on aberrant behavior," U.S.S.G. app. C, amend. 651, we do not view this amendment as expanding the scope of coverage.

The Guideline provides that, in determining whether the downward departure is appropriate, the court may consider "the defendant's (A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense." *Id.* § 5K2.20, cmt. n.3.

Considering these factors, May's case is demonstrably unexceptional. The evidence does suggest that May's mental or emotional condition is impaired in that he suffers from Post-traumatic Stress Disorder as a result of his military service during the Vietnam War; however, there is no indication that this condition contributed to his criminal activities. As the court found, "there's no evidence of a nexus between post-traumatic stress disorder and the events in question." And although May presented evidence that he had been gainfully employed with the postal service for a number of years and got along well with his coworkers, such behavior is hardly exceptional. Similarly, the only evidence May presented that arguably pertains to his prior good works is a letter and certificate of appreciation recognizing his participation in one of the postal service's affirmative action special emphasis programs, the Charlotte Postal Touring Chorale. Even when considered together, singing in a chorale and getting along with coworkers are insufficient to render May's case exceptional. The next factor, his motivation for committing the offenses, weighs against May. May admittedly burned the cross to, in his words, "let the nigger know he wasn't welcomed here." Far from exceptional, this motivation likely underlies nearly every incident of cross burning, and it certainly is not a motivation worthy of a downward departure.[16] Finally, May has presented no evidence that he made efforts to mitigate the effects of his criminal activity. Weighing these factors both individually and in the aggregate, May's case is not

---

[16]May contends that his acts were motivated not by racial animus but by the victim's conduct. As we have explained in Part III.A, the victim's conduct does not warrant a downward departure, and we decline to revisit the issue in analyzing another Guideline provision. Regardless, the motivation of racial intimidation is clear in these circumstances, and it was acknowledged by May when he pleaded guilty.

exceptional, and a downward departure based on aberrant behavior is not justified.[17]

## C.

Finally, we turn to the court's decision to decrease May's offense level based on acceptance of responsibility. *See* U.S.S.G. § 3E1.1 ("If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels."). We have previously explained that, "in order to receive a reduction under § 3E1.1 for acceptance of responsibility, the defendant must prove by a preponderance of the evidence that he has clearly recognized and affirmatively accepted personal responsibility for his criminal conduct." *United States v. Nale*, 101 F.3d 1000, 1005 (4th Cir. 1996); *see also United States v. Harris*, 882 F.2d 902, 906-07 (4th Cir. 1989) (stating that "the party seeking application of Guideline § 3E1.1 . . . [has] the burden of persuading the court that he [is] entitled to it, and that the proper standard of proof in resolving factual disputes during the sentencing process is the preponderance of evidence standard"). Because May failed to carry his burden of proving that he accepted responsibility for his crimes, the court clearly erred in granting him a sentence adjustment for acceptance of responsibility.

At the sentencing hearing, the court found no facts regarding acceptance of responsibility other than May's guilty plea, stating simply, "he gets two points off for acceptance. He pled guilty. All the elements are there. Everything is there. He gets the two points off." As we have previously held, however, an adjustment for acceptance of

---

[17]Even if May's case were deemed exceptional, we are unconvinced that May's crimes would meet the requirements of section 5K2.20. Although the acts he committed likely did not require significant planning, they were not of particularly limited duration. May asserts that "the offense lasted one evening at most." On the contrary, May and Carpenter's altered "NO TRESPASSING" sign remained posted for a full month. In addition, May committed three drug crimes while on bond, and he fabricated a ridiculous excuse for how the cocaine ended up in his system. *See supra* p. 4. This conduct evidenced not only May's failure to lead an otherwise law-abiding life but also a blatant disrespect for the law.

responsibility does not flow automatically from a guilty plea. *United States v. Apple*, 915 F.2d 899, 913 (4th Cir. 1990) ("A defendant who enters a guilty plea is *not* entitled to a sentencing reduction as a matter of right; a guilty plea *may* provide some evidence of the defendant's acceptance of responsibility, but it does not by itself entitle a defendant to the two level reduction." (internal citation omitted)); U.S.S.G. § 3E1.1, cmt. n.3 ("A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right."). May's guilty pleas alone therefore did not justify the acceptance of responsibility adjustment.

Moreover, the evidence that May failed to accept responsibility clearly outweighs his pleas of guilty. *See id.* § 3E1.1, cmt. n.3 (providing that entry of guilty plea and admitting offense conduct "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility"). First, the application notes to section 3E1.1 indicate that a court may consider whether the defendant has "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admitt[ed] or not falsely den[ied] any additional relevant conduct . . . ." *Id.* § 3E1.1, cmt. n.1(a). Here, the PSR indicates that May "currently denies most of the key facts in the offense conduct." In particular, May submitted a written statement to the probation officer that asserted, "[p]revious to the day of the incident, the defendant had done nothing to harm or intimidate Sanders or to harm or intimidate anyone based on their race." This statement explicitly denies the first overt act of the conspiracy to which May pleaded guilty; that is, altering the "NO TRESPASSING" sign — a month before the cross burning — to contain the racially intimidating message "ESPECIALLY NIGGERS."[18] Moreover, May's objections

---

[18]As a general proposition, overt acts in furtherance of a conspiracy need not, in and of themselves, constitute criminal behavior. *United States v. Jerkins*, 871 F.2d 598, 602-03 (6th Cir. 1989) (citing *Braverman v. United States*, 317 U.S. 49, 53 (1942)); *Luxenberg v. United States*, 45 F.2d 497, 498 (4th Cir. 1930) ("The overt act need not be a criminal act, nor need it constitute the very crime that is the object of the conspiracy."). Nonetheless, a defendant's denial of the alleged overt acts may be considered when assessing acceptance of responsibility, as overt acts constitute relevant conduct under section 1B1.3. U.S.S.G. § 3E1.1, cmt. n.1(a) (including, as appropriate considerations, "truthfully admitting or

to the presentence report stated that May "denies any involvement in making or posting [the "NO TRESPASSING"] sign[,] . . . denies ever approaching Sanders with a gun and threatening him[,] . . . den[ies] any involvement in constructing the wooden structure being construed as a cross[, and] was not in possession of a firearm when police contacted him at the scene that evening." By these objections, May denies nearly all of the overt acts of the § 241 conspiracy of which he was convicted. According to our precedent, "in order for section 3E1.1 of the guidelines to apply, a defendant must first accept responsibility for *all* of his criminal conduct." *United States v. Gordon*, 895 F.2d 932, 936 (4th Cir. 1990) (emphasis added). May's statement to the probation officer belies his acceptance of responsibility for all of the conduct to which he pleaded guilty.

In addition, the probation officer correctly concluded that May did not accept responsibility because he minimized his role in the offense and attempted to explain away his behavior. In his statement to the probation officer, May placed the blame squarely on Sanders. He wrote, "[t]he defendant fully accepts responsibility for his conduct reflected in Counts One and Two of the Indictment. However, certain circumstances contributed to the commission of this offense." May then proceeded to specify the alleged bad qualities and behavior of the victim Sanders that May believed lessened his own culpability. He also explained his criminal acts by asserting that the medication he had taken that night mixed with alcohol and affected his behavior. Admitting to criminal activity while attempting to justify or explain it away does not indicate acceptance of responsibility. *See Nale*, 101 F.3d at 1005 (affirming denial of acceptance of responsibility adjustment where defendant, who carjacked at gunpoint and raped ex-girlfriend, "characterized his actions as an attempt to reconcile with his ex-girlfriend and . . . characterized the carjacking as a request for a ride"). Additionally, May downplayed his criminal offenses, stating that "he and Carpenter drank alcohol as they sat around a fire they had

not falsely denying any additional relevant conduct for which the defendant is accountable under section 1B1.3 (Relevant Conduct)"); *id.* § 1B1.3(a)(1)(A) (providing that relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant").

built." In sum, May's statement to the probation officer purports to accept responsibility but immediately proceeds to blame the victim and explain away his criminal conduct.

Finally, the application notes to U.S.S.G. section 3E1.1 provide that "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility" is a relevant consideration when deciding whether to grant the sentencing adjustment. U.S.S.G. § 3E1.1, cmt. n.1(h). May pleaded guilty just four days before his trial was to begin, sixteen months after he was indicted, and only after his co-defendant Carpenter pleaded guilty. This delay further calls into question May's assertion that he has accepted responsibility for his crimes.

We recognize that the determination of the sentencing judge is ordinarily entitled to great deference on review. *See id.* § 3E1.1, cmt. n.5. In these circumstances, however, where the defendant has denied much of the offense conduct, shifted the blame to his victim, and sought to minimize his criminal activity, we are "left with the definite and firm conviction," *U.S. Gypsum Co.*, 333 U.S. at 395, that the court erred in adjusting May's sentence for acceptance of responsibility.

IV.

Pursuant to the foregoing, we vacate May's sentence and remand for such further proceedings as may be appropriate.

*VACATED AND REMANDED*